MICHAEL FRANCIS LYNCH AND KAREN SUE LYNCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentLynch v. CommissionerDocket No. 3886-80.United States Tax CourtT.C. Memo 1982-305; 1982 Tax Ct. Memo LEXIS 439; 44 T.C.M. (CCH) 21; T.C.M. (RIA) 82305; June 3, 1982. Michael F. Lynch, pro se. Rose A. Mendes, for the respondent. DAWSONMEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency in petitioners' 1976 Federal income tax of $ 1,796.94. On March 1, 1976, petitioner Michael Lynch withdrew from the partnership of Lynch, Lynch & Tucker, an accounting firm. All of the issues presented for decision involve the tax consequences stemming from his disassociation with the firm. They are as follows: (1) Whether certain payments received by petitioner prior to his withdrawal from the partnership constitute guaranteed payments under section 707(c)1 rather than distributions taxable under sections 731(a) and 741. (2) Whether a portion of the payments received in connection with his withdrawal are attributable to unrealized*443 receivables and therefore taxable as ordinary income. (3) Whether petitioner had a basis in his partnership interest in excess of zero. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and joint exhibits are incorporated herein by reference. The relevant facts are summarized below. Petitioners Michael Francis Lynch (hereinafter referred to as petitioner) and Karen Sue Lynch are husband and wife and resided in Nashport, Ohio when they filed their petition in this case. They filed a joint Federal income tax return for 1976 with the Internal Revenue Service Center in Cincinnati, Ohio. On January 1, 1972, petitioner entered into a partnership with his father, Thomas F. Lynch, Sr., for the purpose of engaging in the business of certified public accounting under the name of "Lynch and Lynch." The elder Lynch had previously carried on a similar business as a sole proprietorship and over a period of years had built up a fairly substantial practice. He contributed all of the partnership's initial capital by transferring to the entity the assets of his sole proprietorship. Although petitioner received a 20-percent*444 interest in the partnership with a fair market value of approximately $ 36,000, he never paid his father for the interest and his total capital contributions while he was a partner amounted to only $ 1,350. The Articles of Co-Partnership signed by petitioner and Thomas Lynch provided for salary payments to the partners for the period from January 1, 1972 to June 30, 1972, as follows: Section 4.1: Participation in Profits or Losses to June 30, 1972:For the initial period of this partnership, from January 1, 1972, through June 30, 1972, the partners shall participate in the profits or losses of the partnership as stated in parts (a), (b), and (c) following: (a) Salaries:The total salary for the initial period for each partner shall be as follows: Thomas F. Lynch, Sr.$ 42,000.00Michael F. Lynch$ 10,010.00These salaries shall be entered in the partnership books at the end of each month and deducted from partnership income, like any other expense, to arrive at the remaining profits in which partners will participate, as stated in part (b) of this section. These salaries will, in effect, represent the division of the first $ 52,010.00 of net*445 partnership profits for the period from January 1, 1972, through June 30, 1972, and may be drawn against at weekly, bi-weekly, monthly or other intervals as agreed to by partners. However, no advance drawing may be made against these salaries, with limitations based on a computation of the ratio of elapsed time to total salary for the period. Salary of M. F. Lynch for period will be guaranteed by other partner as to current drawing and eventual full participation in profits for period. (c) Participation in Net Loss of Partnership:If there is a net partnership loss for this initial period, after applying the partners' salaries as stated in part (a) of this section, the partners shall participate in the loss as follows: Thomas F. Lynch, Sr.42,000/52,010. of lossMichael F. Lynch10,010/52,010. of lossFor periods beginning after June 30, 1972, the amount of the partners' salaries was increased, but the other rules governing the payments remained the same. Draws against salaries were to be charged to drawing accounts as provided in section 3.3 of the Articles of Co-Partnership: Section 3.3: Drawing Accounts.A separate drawing account shall be*446 established for each partner. Drawing against partners' salaries as stated in Section 4, shall be charged to partners drawing accounts. The portion of each partner's salary applicable to one month shall be credited to his drawing account at the end of each month with an offsetting charge to partners' salary expense. Article IX of the Articles of Co-Partnership provided that any amendments to the agreement were to be agreed upon in writing by the partners. It also stated that new partners would automatically become parties to the existing agreement. In June 1972 Gerald R. Tucker was admitted to the partnership and the firm name was changed to Lynch, Lynch, & Tucker. Tucker was given a 20-percent interest in the business and Thomas Lynch's interest was reduced from 80 to 60 percent. The partnership reported its income on the basis of a taxable year ending September 30 and used the cash method of accounting. All three of the partners performed services for the partnership. Each month they drew money out of the partnership and charged it to their respective drawing accounts. At year-end accounting entries were made to close out the drawing accounts to the partners' capital*447 accounts. The capital accounts were also adjusted to reflect each partner's distributive share of income or loss for the year. In computing the partnership net income or loss, the amounts previously withdrawn were not claimed as salary deductions and did not affect the determination of the partners' distributive shares. Consistent with this accounting treatment, the partnership tax returns did not report any payments of salary or interest to any of the partners. All of these accounting and reporting practices were consistently followed by the partnership through the taxable year ending September 30, 1975. The following is an analysis of petitioner's capital account through the taxable year ended September 30, 1975: Taxable yearBeginningCapitalShare of bookEndingendingbalancecontributionsnet incomeDrawsbalance9-30-72$ 750.00$ 15,015.00($ 15,015.00)$ 750.00 9-30-73$ 750.00 600.0010,660.00(21,320.00)(9,310.00)9-30-74(9,310.00)21,418.79(23,640.00)(11,531.21)9-30-75(11,531.21)27,867.08(26,650.00)(10,314.13)The draws and allocable shares of book net income of the other two partners*448 during this same period were as follows: Gerald TuckerThomas LynchTaxable yearShare ofShare ofendingDrawbook net incomeDrawbook net income9-30-72$ 5,005.00$ 5,005.00$ 32,630.00$ 5,244.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,320.0010,660.0044,684.5618,891.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,640.0019,885.7873,990.0081,093.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,790.0027,747.3151,199.9552,001.07Severe disputes between petitioner and his father forced him to withdraw from the partnership on March 1, 1976. The negotiations concerning the buy-out of his interest were acrimonious and took place over a period of several months. Under the Agreement of Withdrawal entered into by the partners petitioner agreed to "withdraw and convey to the Surviving Partners his interest" in the partnership for $ 52,500, which sum was evidenced by a promissory note executed by Thomas Lynch and Gerald Tucker. The agreement absolved petitioner from any liability for the debts of the partnership, and further provided that he would not be liable for any deficit in his capital account or for any other amounts borrowed from the partnership. It also released him from any liability on a debt which*449 allegedly arose when petitioner acquired his partnership interest in 1972, as follows: 4. Surviving Partner, Thomas T. Lynch, does hereby release the Withdrawing Partner from any and all liability upon a debt payable to said Surviving Partner for the purchase of his partnership interest in the amount of Thirty-six Thousand Dollars ($ 36,000.00) and any and all interest due thereon. This agreement shall not be construed in any way, directly or indirectly, to constitute an admission by Withdrawing Partner of the existence of said debt. In addition, the agreement contained a provision which dealt with Michael's draw and distributive share of income or loss up to the date of his withdrawal: 2. Withdrawing Partner shall not be entitled to share in any of the profits of said partnership either as a partner or an employee whether earned or accrued before or after the termination date, and shall cease to have any interest or right in or to any of the assets of the partnership, including but not limited to, accounts receivable, amounts due from clients for time worked but not billed and any of the other assets of the partnership either tangible or intangible.PROVIDED, that Withdrawing*450 Partner's Schedule K-1 for the partnership year ending September 30, 1975 shall be as indicated on the attached Exhibit, C; PROVIDED FURTHER that the parties agree that the Withdrawing Partner's draw and share of partnership profit or loss for income tax purposes for the period of September 30, 1975 to [February] 29, 1976 shall be as follows: Draw$ 12,075.00Profit/(Loss)$ 1,960.05 lossThe amount shown as "Draw" in the Agreement of Withdrawal represented the sum of the amounts charged to petitioner's drawing account for the period from October 1, 1975 to February 29, 1976. As of February 29, 1976, the total assets of the partnership, with the deficit capital accounts of petitioner and Gerald Tucker reclassified as loans receivable from the partners, and excluding billed and unbilled trade accounts receivable, were $ 63,648.31. Included in these assets was a note receivable from petitioner in the amount of $ 1,450. In addition to these assets, the partnership had billed and unbilled accounts receivable totaling $ 163,762.28, of which $ 120,000 was considered to be collectible. Petitioner's 20-percent interest in this amount was $ 24,000. As*451 of February 29, 1976, the total liabilities of the partnership after offsetting the deficit capital account balance of Thomas Lynch against a debt owed him by the partnership was $ 63,648.31. Petitioner's 20-percent share of these liabilities was $ 12,729.65. In negotiating the buy-out price for petitioner's partnership interest, the parties took into consideration a number of factors, including (1) petitioner's deficit capital account balance of $ 12,350.38, (2) his interest in unrealized accounts receivable, (3) the $ 36,000 debt which petitioner allegedly owed to his father for the purchase of his interest, and (4) his interest in the value of the firm as a going concern, which the parties agreed was equal to 20 percent of the gross fees earned by the partnership in the preceding 12-month period. When they finally reached agreement on the terms of the buy-out, however, the parties did not specify what portion of the purchase price was attributable to the unrealized accounts receivable. During the calendar year 1976 petitioner received principal payments on the $ 52,500 promissory note totaling $ 29,650. On January 31, 1977, the partnership, then operating under the name*452 of "Lynch, Tucker & Associates," mailed petitioner a Form 1099 (Miscellaneous Income) which indicated that he had received $ 55,449.18 in income from the partnership during 1976. The payments were characterized on the form as "Sec. 751, 752 Distributions." An attached schedule revealed the composition of the $ 55,449.18 amount: (1) Payments on note$ 29,650.00(2) Deficiency in capital account, 10/1/7510,314.13(3) Partnership loss, 10/1/75 to 2/29/761,960.05(4) Drawing account, 10/1/75 to 2/29/7612,075.00(5) Balance of loan owed to partnership1,450.00Item (5), 1099 MISC Total$ 55,449.18On March 1, 1977, the partnership mailed a revised Form 1099 to petitioner indicating "Sec. 751, 752 Distributions" in the lesser amount of $ 43,450.38, comprised of the following: (1) Payments on note$ 29,650.00(2) Deficiency in capital account, 10/1/7510,314.13(3) Partnership book loss, 10/1/75 to 2/29/762,036.25(4) Balance of loan owed to partnership1,450.00Item (5), 1099 MISC Total$ 43,450.38In addition, petitioner also received a Schedule K-1 from the partnership which indicated on line 1 that his salary, interest, *453 and distributive share of income or loss for the fiscal year ending September 30, 1976, was $ 10,114.95, computed as follows: Salary$ 12,075.00 Distributive share of partnership loss(1,960.05)Total$ 10,114.95 Accompanying the Form 1099 and Schedule K-1 was an analysis of book and tax net income of the partnership for the period from October 1, 1975 through February 29, 1976. It detailed the manner in which petitioner's distributive share of the partnership net loss was computed: (1) Cash net income per books$ 34,648.74 (2) Less: Partners' draw for period:T.F.L.$ 20,680.00 M.F.L.12,075.00 G.R.T.12,075.00 44,830.00 (3) Book net (loss) before adjustmentsfor income tax purposes$ (10,181.26)(Book net loss divided): (a) T.F.L.60%$ (6,108.76)(b) M.F.L.20%(2,036.25)(c) G.R.T.20%(2,036.25)(d) Totals100%$ (10,181.26)(4) Adjustments for income tax purposes: (a) Partners' life and medical insurancepremiums$ 677.27 (b) "Special" adjustment for taxpurposes: $ 711.06 X 5/12(296.28)(c) Net adjustments for tax purposes380.99 (5) Income tax return net (loss)$ ( 9,800.27)(Income tax net loss divided): (a) T.F.L.60%$ (5,880.17)(b) M.F.L.20%(1,960.05)(c) G.R.T.20%(1,960.05)(d) Totals100%$ (9,800.27)*454 An adjusting entry was made on the partnership books at the close of the 1976 fiscal year to transfer the balances in the partners' drawing accounts (including the $ 12,075 balance in petitioner's drawing account) to salary expense. Similarly, the partnership tax return for the taxable year ended September 30, 1976 listed the draws of the partners as a deduction on line 14 under the caption "Payments to partners--Salaries and interest." In his 1976 Federal income tax return petitioner reported a long-term capital gain on "Liquidation of partnership interest--Lynch, Lynch & Tucker" in the amount of $ 51,449.18. This gain was computed by subtracting his alleged basis in his partnership interest ($ 4,000) from the amount shown on the initial Form 1099 ($ 55,449.18). On Schedule E of his return petitioner reported an ordinary partnership loss of $ 1,960.05. In his notice of deficiency respondent determined, among other things, that petitioner had erroneously computed the gain on the transfer of his partnership interest and understated the amount of his partnership ordinary income. Specifically, he determined that the actual payments received during the year in connection with*455 the transfer totaled $ 43,828.47, rather than $ 55,449.18, as claimed by petitioner. The breakdown of the payments per respondent's determination was as follows: Payments on note$ 29,650.00 Cancellation of debtowed by petitioner1,450.00 Petitioner's share ofpartnership liabilitiesassumed by remainingpartners12,729.65 Unexplained difference( 1.18)$ 43,828.47 Part of the difference between the two figures was attributable to respondent's reclassification of the $ 12,075 in draws received by petitioner before the transfer as ordinary partnership income rather than as payments received in liquidation of his partnership interest. Respondent further determined that $ 7,597.68 of the adjusted amount realized of $ 43,828.47 was taxable as ordinary income under section 736. He also assigned a zero basis to petitioner's partnership interest instead of the $ 4,000 basis claimed on the return for purposes of computing the realized long-term capital gain. Finally, as a corollary adjustment to his reclassification of the $ 12,075 draws as ordinary income, respondent determined that petitioner owed self-employment tax in the amount of $ 412.21. *456 2OPINION Issue 1. Characterization of petitioner's drawsPetitioner performed professional accounting services for his accounting partnership for the period October 1, 1975 to February 29, 1976. During this time he received monthly payments from the partnership in the total amount of $ 12,075. These payments were recorded on the partnership books as charges to petitioner's drawing account. Petitioner did not report the $ 12,075 amount as ordinary income on his 1976 Federal income tax return. Instead, he treated it as a distribution in liquidation of his partnership interest, thereby increasing the long-term capital gain reported on that transaction. Respondent takes the position that the payments received by petitioner were guaranteed salarly payments under section 707(c)3 because they were determined without regard to the income of the partnership. Thus, he contends that the amounts are taxable as ordinary income under section 61(a). Petitioner, on the other hand, appears to maintain that the payments were in the nature of current*457 or liquidating distributions taxable as capital gain under the rules of section 731(a) and section 741. He relies primarily on the fact that until fiscal year 1976 the partnership had never before treated the amounts charged to the drawing accounts as guaranteed salary payments for either book or Federal income tax purposes. He also argues that the initial Form 1099 he received from the partnership, which characterized the payments as distributions rather than salary, accurately reflected the substance of the payments as well as the intent of the partners. Finally, he contends that the Agreement of Withdrawal specifically limited his taxable distributive share for fiscal 1976 to a $ 1,960.05 ordinary loss, and therefore any attempt to tax his partnership draws as additional ordinary income would contravene the terms of that agreement and effectively nullify the partners' right to fix the distributive share of a departing member. After carefully reviewing the record, we conclude that petitioner has failed to meet his burden of proof on this issue and we sustain respondent's determination. *458 Section 707(c) states that payments made to a partner for services which are determined without regard to partnership income will be deductible by the partnership (provided they otherwise satisfy the tests of section 162) and includable in the partner's gross income. In determining whether a particular payment qualifies under this section, the substance of the transaction must prevail over its form. Falconer v. Commissioner,40 T.C. 1011, 1015 (1963). In this case the task of ascertaining the substance of the draws has been greatly complicated by petitioner's failure to present any evidence regarding the manner in which each partner's annual draw was computed. Obviously, such information would be of the utmost importance in determining the nature of the payments, but petitioner apparently was convinced that he could carry his burden of proof merely by showing that in prior years the partnership did not treat the draws as salary expense for either book or income tax purposes. In our judgment, however, the partnership's prior handling of the draws is only one factor to consider*459 in resolving the issue, and it is certainly not determinative. Admittedly, we find it disturbing that the partnership chose to record the draws in pre-fiscal 1976 years as current distributions which ultimately reduced the partners' capital accounts when the drawing accounts were closed out at year-end. This treatment suggests that the partners regarded the payments as draws or advances against their respective distributive shares of partnership profits. Since such payments are generally determined with regard to partnership income, either actual or anticipated, they clearly do not qualify as section 707(c) payments. Instead, they are treated as current distributions to the partner on the last day of the partnership's taxable year, see section 1.731-1(a)(1)(ii), Income Tax Regs., at which time the partner also receives a step-up in the basis of his partnership interest to reflect his distributive share of partnership income. See section 705(a). If the draws equal distributive share, the effect is a wash and no gain is triggered by the distributions. However, a comparison of draws to distributive shares in prior years, while not conclusive, *460 lends credence to respondent's assertion that the payments were not determined by reference to the partner's anticipated share of partnership income. We note, for example, that in fiscal 1973 both petitioner and Gerald Tucker withdrew amounts which exactly doubled their respective distributive shares of book net income, and in fiscal 1974 their draws exceeded distributive shares by several thousand dollars. A similar situation prevailed on the date of petitioner's withdrawal, at which time the partners' cumulative draws exceeded book net income by some $ 10,000. This pattern of excess draws created a deficit in petitioner's capital account beginning in fiscal 1973 which he made no attempt to restore in later years, a fact which suggests that the amounts received were not advances out of current earnings, but rather guaranteed payments of salary. Other evidence which supports guaranteed payment characterization is the partnership agreement itself. The Articles of Co-Partnership executed by petitioner and his father specifically provided that they were to receive guaranteed salary payments irrespective of partnership profits and losses. The Articles also provided that the payments*461 were to be deducted by the partnership in determining the net income or loss to be allocated to the partners. It is not clear from this record whether a revised partnership agreement was drawn up when Gerald Tucker joined the partnership in June 1972. In this connection, the Articles state that new partners may be admitted to the firm upon the agreement of the existing partners, and the additional partners automatically become parties to the existing partnership agreement. Yet, obviously some changes were required in the agreement to provide for Gerald Tucker's profit-sharing interest and drawing rights. We have no way of knowing what agreements or understandings may have been reached on these matters, but if there were any, an if they resulted in the deletion of the guaranteed payment provisions from the Articles, it was clearly incumbent on petitioner to testify as to the substance of the new agreements. Absent such evidence, the inference can fairly be drawn that the draws were made under the aegis of the guaranteed salary provisions, notwithstanding the partnership's failure to record them as salary expense on its books and records. At any rate, regardless of how the partners*462 characterized the payments in prior years, we are satisfied that they intended to treat petitioner's draws from October 1, 1975 through February 29, 1976 as deductible guaranteed payments. Throughout this period petitioner performed services for the partnership and, as usual, he received regular cash payments which were charged to his drawing account. There is no evidence to indicate that these payments were computed as a function of partnership income, thereby rendering them ineligible for section 707(c) treatment. More importantly, we are convinced that petitioner knew full well that his draws had been deducted in arriving at the distributive share of loss specified in the Agreement of Withdrawal. The schedule which accompanied his K-1 for the 1976 fiscal year clearly shows that the draws of all the partners were deducted from the partnership's income through the cut-off date in arriving at the loss figure.We refuse to believe that petitioner, a certified public accountant, would have signed the Agreement of Withdrawal without knowing exactly how his distributive share had been computed, particularly since the negotiations surrounding his withdrawal were protracted and bitterly*463 disputed. What petitioner is asking us to believe, in effect, is that the other partners purposefully arranged to shelter him from any partnership ordinary income for the period ending on the withdrawal date by arbitrarily fixing his distributive share as a $ 1,960.05 loss, when in fact the partnership had a positive net income for the period (discounting draws) of $ 34,648.74. In other words, he interprets the Agreement of Withdrawal as giving him the best of both worlds--the right to retain the $ 12,075 in draws without having to report any ordinary income for the period preceding his departure. We read the Agreement differently. It merely states that, for income tax purposes, his "draw" and "share of partnership or loss" for the abbreviated period were to be $ 12,075 and ($ 1,960.05), respectively. Nothing in the Agreement indicates that the remaining partners agreed to shoulder a disproportionate share of the tax burden as a form of additional consideration for the surrender of petitioner's interest. Yet, that would be the logical result if the partnership were not permitted to deduct petitioner's draws as salary. It is evident from the manner in which petitioner's distributive*464 share was computed that such a result is not what Gerald Tucker and Thomas Lynch intended, and we think petitioner shared in their understanding. Under these circumstances, we attach little significance to the fact that the partnership erroneously included the draws in the initial Form 1099 mailed to petitioner the following year. Based on the foregoing, we hold that the $ 12,075 in draws are taxable as guaranteed payments under section 707(c). Thus, they constitute ordinary income to petitioner under section 61(a). Respondent's determination of additional self-employment tax on such amount is also sustained. Issue 2. Allocation of withdrawal proceeds to unrealized receivablesAs of February 29, 1976, petitioner's interest in the unrealized receivables of the partnership, reduced by an allowance for uncollectible accounts, was $ 24,000. In computing the gain realized on his withdrawal, petitioner did not allocate any portion of the proceeds to his interest in the unrealized receivables. Nor was any such allocation provided in the Agreement of Withdrawal. Consequently, in his notice of deficiency respondent determined that $ 7,597.68 of the payments received during*465 calendar year 1976 was attributable to unrealized receivables and therefore taxable as ordinary income under section 736. 4*466 Petitioner disputes this adjustment, although he has presented no evidence or arguments which would indicate that it was improper. Assuming petitioner's withdrawal is properly cast as a liquidation, 5 payments for his interest in unrealized receivables would constitute ordinary income (distributive share or guaranteed payments) under section 736(a). This is because section 706(b)(2)(A) specifically excludes payments for unrealized receivables from section 736(b), which states that payments made in exchange for a partner's interest in partnership property will be treated as a distribution rather than a payment described in section 736(a). Thus, in the liquidation context payments for unrealized receivables automatically fall within the general rule of section 736(a) and are taxable as ordinary income. If, on the other hand, one assumes that petitioner's withdrawal is characterized as a sale of his interest to the remaining partners, a similar result would obtain through the operation of section*467 751(a), 6 which provides that payments received in exchange for a partnership interest are to be treated as amounts realized from the sale of property other than a capital asset to the extent they are attributable to unrealized receivables or substantially appreciated inventory. *468 Normally the parties' allocation of the sale proceeds between unrealized receivables and other partnership property will be respected if it is a product of arm's-length negotiations. See section 1.751-1(c)(3), Income Tax Regs. A similar rule applies with respect to payments under section 736. See section 1.736-1(b)(1), Income Tax Regs. Here, however, the partners made no attempt to allocate a portion of the withdrawal proceeds to petitioner's interest in unrealized receivables. Although respondent does not explain how he arrived at his allocation, the amount appears reasonable considering petitioner's actual interest in the receivables on the date of withdrawal ($ 24,000) and the amount of payments he received during the taxable year ($ 43,828.47). 7 Consequently, we sustain respondent's determination. Issue 3. Basis of Partnership interestIn computing his gain on the withdrawal, petitioner*469 used a basis in his partnership interest of $ 4,000. In the notice of deficiency respondent determined that the interest had a zero basis. Petitioner now maintains that his basis was actually in the neighborhood of $ 40,000. He claims that he acquired the partnership interest by gift from his father, and that at the time of the transfer his father's basis therein equaled or exceeded its fair market value of $ 36,000. Thus, he contends that he took a carryover basis in the property under section 1015 of $ 36,000. Once again, the facts do not support petitioner's contention. First, petitioner introduced no evidence, other than his own statement, to prove that he acquired the interest by gift. Other evidence in the record belies his assertion. Both the Agreement of Withdrawal and certain negotiating memoranda prepared by petitioner's father make reference to a $ 36,000 debt allegedly owed by petitioner in connection with his admission into the partnership. Although petitioner has consistently denied the existence of such an obligation, his father apparently believed differently. In our view petitioner has failed to carry his burden of proof that he acquired the interest by gift, *470 and we so hold. Second, even if petitioner had proved that such a gift took place, he still has not established that the basis of the interest at the time of transfer was at least equal to its fair market value. Petitioner also included in his basis the amount of the $ 1,450 loan from the partnership which was forgiven upon his withdrawal. This is clearly wrong, as are certain other figures which appear in his basis computation. However, respondent also erred in failing to give effect in his computation to petitioner's share of partnership liabilities (see sections 752(a) and 722) and distributive share of book net loss for the period preceding the withdrawal (see section 705(a) and section 1.705-1(a)(1), Income Tax Regs.). With these observations in mind, we have reconstructed petitioner's basis as follows: PartnershipCapitalShare of bookDraws *taxable yearcontributionsnet income (loss)(sectionending(section 722)(section 705(a))733(1))Total9-30-72$ 750.00$ 15,015.00 ($ 15,015,00)9-30-73600.0010,660.00 (21,320.00)9-30-7421,418.79 (23,640.00)9-30-7527,867.08 (26,650.00)9-30-76(2,036.25)Totals$ 1,350.00$ 72,924.62 $ 86,625.00 ($ 12,350.38)Add: Share of liabilities at     2-29-76 (sections 752(a) and 722)12,729.65 $   379.27 *471 Accordingly, we hold that petitioner's basis for computing the gain on his withdrawal is $ 379.27. To reflect our conclusions herein and various concessions by the parties, Decision will be entered under Rule 155.Footnotes1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue, unless otherwise indicated.↩2. Through a typographical error, the amount of this adjustment was incorrectly stated in the notice of deficiency to be $ 12.21.↩3. SEC. 707. TRANSACTIONS BETWEEN PARTNER AND PARTNERSHIP. (c) GUARANTEED PAYMENTS.--To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a)↩ (relating to trade or business expenses).4. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) PAYMENTS CONSIDERED AS DISTRIBUTIVE SHARE OR GUARANTEED PAYMENT.--Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered-- (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) PAYMENTS FOR INTEREST IN PARTNERSHIP.-- (1) GENERAL RULE.--Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary * * *, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) SPECIAL RULES.--For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for-- (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.↩5. Although respondent characterized the withdrawal as a liquidation in the notice of deficiency, certain aspects of the transaction, including the language of conveyance used by the parties in their Agreement of Withdrawal, suggest that sale characterization may be more fitting. We need not decide this issue since petitioner's interest in unrealized accounts receivable would be taxable as ordinary income in either case. ↩6. SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS. (a) SALE OR EXCHANGE OF INTEREST IN PARTNERSHIP.--The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to-- (1) unrealized receivables of the partnership, or (2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset.↩7. Presumably some additional ordinary income will be recognized by petitioner as a result of the unrealized receivables when he collects the balance due on the $ 52,500 promissory note ($ 22,850) in the following taxable year.↩*. Both parties agree that prior year's draws should be treated as distributions for basis purposes, and we have relied on their agreement for purposes of this reconstruction. We need not, and do not, express an opinion on whether this characterization accurately reflects the substance of the payments.↩